**PLANTERS AND CITIZENS BANK and Resolution Trust Corporation as Receiver for Great Southern Federal Savings & Loan Association, Plaintiffs,**

v.

**The HOME INSURANCE COMPANY, and Pennsylvania Millers Mutual Insurance Company, Clark Wiggins, Jr., David L. Beecher, Darrell Crosby and Cameron Crummey, Defendants,**

**and**

**PENNSYLVANIA MILLERS MUTUAL INSURANCE COMPANY, Defendant and Third Party Plaintiff,**

v.

**E. Mills TARVER and Hugh Oliver, Third Party Defendants.**

**No. CV: 490–283.**

United States District Court, S.D. Georgia, Savannah Division.

Feb. 19, 1992.

Ashley M. Hodges, Adams, Gardner & Ellis, Wendy Woods Williamson, Oliver, Maner & Gray, Savannah, Ga., Brian Daniel Solomon, Frederick Leo Bateman, Jr., Pennington, Wilkinson, Dunlap, Bateman & Camp, Tallahassee, Fla., for plaintiffs.

Samuel Powel Inglesby, Jr., Inglesby, Falligant, Horne, Courington & Nash, Savannah, Ga., for intervenor-plaintiff.

Kenneth August Hindman, Drew, Eckl & Farnham, Atlanta, Ga., John Milton Tatum, Miller, Simpson & Tatum, Savannah, Ga., Robert Spencer Bomar, Kevin Allan Wangerin, Atlanta, Ga., for defendants.

## ORDER

EDENFIELD, Chief Judge.

This action arises out of the financial collapse of the Mascot Pecan Company ("Mascot Pecan"), and contains allegations of fraudulent business operations, negligent government inspections, parsimonious insurance practices, and reckless lending procedures. To date, the parties have filed six summary judgment motions and three motions to dismiss, as well as numerous other miscellaneous motions. The Court already has resolved most of these motions.

In this Order, the Court will address the motion of The Home Insurance Company ("Home Insurance") for summary judgment against Plaintiffs Planters & Citizens Bank ("P & C Bank) and the Resolution Trust Corporation ("RTC"). As a threshold matter, the Court DENIES the Plaintiffs' motion to strike Home Insurance's reply brief. Although there is no express provision for reply briefs in the Local Rules of the Southern District of Georgia, the Court customarily accepts and considers reply briefs.

The Court also will consider P & C Bank's motion for summary judgment against Pennsylvania Millers Mutual Company ("Pennsylvania Millers"), and Pennsylvania Millers's motion for summary judgment against both P & C Bank and RTC. The Court DENIES the Plaintiffs' motion to strike Pennsylvania Millers' summary judgment motion. Given the Court's extension of the discovery period, and the ambiguity in the minute order resulting from the status conference, the Court finds that Pennsylvania Millers' motion for summary judgment is timely.

### BACKGROUND

This Court already has entered several orders in this litigation, describing the underlying facts of the case in each order. Because the Court assumes that the reader is familiar with the outline of this case, this Order sets forth only those facts that are necessary to address the motions before the Court. These facts are drawn from the parties' Local Rule 6.6. submissions, and from the briefs and depositions tendered by the parties.

During the relevant period, Mascot Pecan purchased, shelled and sold pecans. Mascot Pecan owned and operated various Glennville, Georgia warehouses, which stored pecans and other agricultural commodities. Georgia law required Mascot Pecan, a public warehouseman, to procure a performance bond to secure its obligations under the Georgia State Warehouse Act. O.C.G.A. § 10–4–12 (1989). On June 20, 1975, Mascot Pecan, as principal, and Penn-

sylvania Millers, as surety, executed a warehouseman's bond in the amount of $100,000. In 1983, the parties increased the sum of the bond from $100,000 to $150,000. The bond required Mascot Pecan to "Perform and fulfill all of [its] duties as a public warehouseman, qualified under the Georgia Warehouse Law, and the rules and regulations promulgated thereunder...." The bond clearly states that, "The Surety shall not be liable for any default on the part of the Principal hereunder unless such default occurs during the term of this bond." The bond remained in effect from 1975 until it was terminated on April 22, 1988. The reasons for termination are unclear.

To obtain financing for its operations, Mascot Pecan entered into a series of loan transactions with P & C Bank and Great Southern Federal Savings Bank ("Great Southern"). On September 7, 1988, Mascot Pecan executed promissory notes in the aggregate amount of $1.6 million to Great Southern. Mascot Pecan pledged warehouse receipts covering a substantial portion of its inventory, as collateral, to Great Southern. RTC, as receiver for Great Southern, now holds three warehouse receipts, one covering 250,000 pounds of shelled pecans, a second covering 230,000 pounds of in-shell pecans, and a third covering 274,000 pounds of in-shell pecans.

On December 18, 1988, Mascot Pecan executed a $299,904.09 promissory note, secured by one warehouse receipt for 500,000 pounds of in-shell pecans and a second warehouse receipt for 158,000 pounds of shelled pecans, to P & C Bank. P & C Bank still holds these two warehouse receipts.

In connection with the loans, Mascot Pecan purchased a casualty insurance policy from the Defendant, Home Insurance. Home Insurance insured Mascot Pecan from January 1, 1988 until December 6, 1989, when Home Insurance canceled the insurance policy. The insurance policy was a multi-peril policy which covered the real and personal property (including 100% of the pecan stock) located on Mascot Pecan's premises. The initial policy, effective January 1, 1988, provided for $5,343,506 of personal property coverage. A renewal policy, extending from January 1, 1989 to January 1, 1990, provided for $4,325,000 of personal property coverage.

Mascot Pecan's activities as a public warehouseman and an agricultural producer were subject to regulation and inspection by the Georgia Department of Agriculture ("GDOA")[1]. The Consumer Protection Division of the GDOA inspected the pecans stored in Mascot Pecan's warehouses for compliance with the Georgia Food Act, O.C.G.A. § 26–2–20 *et seq.* (1982 & Supp.1991), and the Warehouse Division of the GDOA performed inspections pursuant to the Georgia State Warehouse Act, O.C.G.A. § 10–4–1 *et seq.* (1989).

Over the years, the GDOA's Consumer Protection Division detected many problems with the pecans stored at Mascot Pecan. In 1984, the GDOA discovered a large quantity of adulterated product, and placed a "withhold from sale" on approximately 1.8 million pounds of pecans. The GDOA tagged some of the lots of adulterated pecans with "stop sale" tags. For many of the adulterated pecans, however, the GDOA merely placed either "stop sale" tags or withhold forms on the doors to the freezers in which the pecans were stored. According to the GDOA, Mills Tarver requested a delay in the destruction of those pecans so he could explore alternatives to destruction. The GDOA complied with this request, and many of the pecans that the GDOA condemned in 1984 were still stored at Mascot Pecan in 1988.

The GDOA reports show that from July 1984 to August 1988, less than 50,000 pounds of the embargoed pecans were re-

---

1. In a series of Orders entered by the Court last year, the Court dismissed the GDOA and the individual GDOA employees from this case because of Eleventh Amendment immunity. *See* Order of October 1, 1991. In an Order dated November 13, 1991, the Court allowed the Plain- tiffs to amend their complaints and reinstate personal capacity claims against the individual GDOA employee Defendants. The Court will address the summary judgment motions by and against these Defendants in a separate order.

leased for voluntary destruction, while approximately 25,000 pounds were released for reconditioning and sale. Mills Tarver stated that he destroyed 120,000 pounds of pecans, independent of the GDOA destructions. The federal Food and Drug Administration seized 148,000 pounds of the embargoed pecans. There are no records documenting the disposition of the remaining one million pounds of pecans.

The Consumer Protection Division discovered smaller amounts of adulterated product over the following years. On March 2, 1987, the GDOA issued a voluntary destruction certificate for the destruction of 6,077 pounds of pecans at Mascot Pecan Company. On September 14, 1987, 4,680 pounds of pecans were destroyed. On June 28, 1988 and August 10, 1988 the GDOA inspected Mascot Pecan and discovered 34,340 pounds of pecans that were part of the 1984 embargo.

The approximately 866,898 pounds of pecans that are the subject of this action were discovered by the GDOA, and voluntarily destroyed by Mascot Pecan, between July 1988 and December 1989. In July 1988, the GDOA found 32 containers of adulterated product that could not be traced to the 1984 embargo. On September 12, 1988 the Consumer Protection Division reinspected the premises and discovered additional adulterated product, unrelated to the 1984 embargo. On September 22, 1988, Clarke Wiggins, District Supervisor of the Consumer Field Forces of the Consumer Protection Division, wrote to Mills Tarver, the president of Mascot Pecan and informed him that the pecans Tarver had identified as "reject stock"—pecans that Tarver planned either to use as oil stock or to reprocess—were "seriously damaged" and "unfit for human consumption." On December 6, 1988, the GDOA placed a withhold from sale on 573,640 pounds of pecans, and took 23 samples

from this batch of pecans for further testing. Mascot Pecan received the test results on May 1, 1989. The test results required Mascot Pecan to destroy voluntarily the pecans or to ship them to a non-food processor. Mascot Pecan destroyed this first batch of pecans, weighing 573,640 pounds, between May 16, 1989 and June 23, 1989. On July 6, 1989, the GDOA placed a withhold from sale on another 241,920 pounds of pecans. Mascot Pecan destroyed this second batch of pecans between October 16, 1989 and October 19, 1989.[2]

By letter dated July 24, 1989, Mascot Pecan notified Palmer & Cay Carswell, the local insurance agency representing Home Insurance, of the loss of the first batch of pecans. On July 26, 1989, Mascot Pecan notified the insurance agency of the loss of the second batch of pecans. Subsequently, Mascot Pecan filed two proof of loss forms, one on October 11, 1989, claiming a loss of $1,500,000, and one on June 5, 1990, claiming a loss of $1,748,196.00. After Home Insurance investigated these claims, it completely denied payment to Mascot Pecan.

In June 1990, in connection with a Chapter 11 bankruptcy proceeding, Mascot entered into a stipulation to abandon its claims under the insurance policy to the benefit of P & C Bank and Great Southern. P & C Bank, standing in Mascot Pecan's shoes, filed this action for breach of contract and bad faith against Home Insurance in October 1990. Home Insurance denied coverage based on the contention that the condemned and destroyed pecans had zero value when the insurance policy went into effect on January 1, 1988. Subsequently, P & C Bank amended its initial complaint, adding Pennsylvania Millers as a Defendant. P & C Bank alleged that it was entitled to recover damages from Pennsylvania Millers under the $150,000

2. Mascot Pecan filed insurance claims for the loss it suffered from the destruction of these two large batches of pecans. Mascot Pecan did not file claims for the 24,800 pounds of pecans destroyed June 28, 1988, nor for two smaller batches destroyed on August 10, 1988 and November 9, 1989. Therefore, despite RTC's assertion that its claim covers all pecans "which were

placed on "withhold" and subsequently released for voluntary destruction ... subsequent to the effective date of the insurance coverage issued by The Home," the Court finds that the Plaintiffs, who are the assignees of Mascot Pecan's insurance claims, are limited to pursuing insurance claims for the two large batches.

warehouseman's bond held by Mascot Pecan.

RTC, a wholly-owned federal corporation, as the receiver for Great Southern, intervened in this action, pursuant to Fed. R.Civ.P. 24(a). RTC asserted claims against the two insurance company defendants. Following discovery, P & C Bank, Home Insurance, and Pennsylvania Millers filed summary judgment motions.

### ANALYSIS

### I. Summary Judgment

"[T]he purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990). The Court "must determine whether there is any genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law." *Warren v. Crawford*, 927 F.2d 559, 561 (11th Cir.1991); *Regan v. United States Small Business Admin.*, 926 F.2d 1078, 1080 (11th Cir.1991) (both citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). Thus, summary judgment is appropriate where the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The substantive law governing the action determines whether an element is essential. *E.g., Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1505 (11th Cir.1989), *cert. denied*, 494 U.S. 1081, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991). The movant may meet the summary judgment burden by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991); *see Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

Only after the movant successfully discharges this initial burden, does the burden shift to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. *Thompson v. Metropolitan Multi–List, Inc.*, 934 F.2d 1566, 1583 n. 16 (11th Cir.1991); *see Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir.1987). In assessing whether the movant is entitled to summary judgment in its favor, the district court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. *E.g., Regan*, 926 F.2d at 1080; *U.S. v. Gilbert*, 920 F.2d 878, 882 (1991). A mere "scintilla" of evidence supporting the opposing party's position, however, will not suffice. *E.g., Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990). The nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Liberty Lobby*, 477 U.S. at 257, 106 S.Ct. at 2514; *Gilbert*, 920 F.2d at 882. This means that the nonmovant "must set forth specific facts showing that there is a genuine need for trial." *Johns v. Jarrard*, 927 F.2d 551, 555 (11th Cir.1991) (citation omitted). Where the facts specifically averred by the nonmovant contradict facts specifically averred by the movant, however, the court must deny the motion. *Lujan*, 110 S.Ct. at 3188.

### II. Home Insurance's Motion for Summary Judgment

■ Home Insurance moves for summary judgment on two grounds. First,

Home Insurance argues that the Plaintiffs will not be able meet their burden of proof regarding the policy's coverage because they can prove neither that the loss occurred within the period of time covered by Home Insurance's policy with Mascot Pecan, nor that the loss was caused by a peril covered by the policy. Second, Home Insurance argues that it was not given immediate notice of the loss as required by the insurance policy and Georgia law. Because the Court finds that Home Insurance is entitled to summary judgment on the coverage issue, the Court will not address Home Insurance's second ground for summary judgment.

### A. Damage or Loss During the Policy Period

The parties hotly contest the date on which the loss or damage to the pecans occurred. Home Insurance contends that the Plaintiffs will be unable to prove at trial that the damage or loss occurred during the policy period and unable to prove that the damage or loss was caused by a peril covered by the policy. Under Georgia law, "a party claiming coverage under an insurance policy has the burden of proving that the claim is covered by the policy." *Continental Cas. Co. v. Synalloy Corp.*, 667 F.Supp. 1550, 1555 (S.D.Ga.1985) (citing, *Chix v. Ga. Farm Bureau Ins. Co.*, 150 Ga.App. 453, 454, 258 S.E.2d 208 (1979)). A plaintiff must prove that the loss or damage, which is the subject of the insurance claim, occurred during the policy period. In the context of life insurance coverage disputes, Georgia courts have held that, "A policy bearing a given date, and purporting to insure for the future only, cannot be made the basis of an action to recover for a loss occurring on a prior date." *Boswell v. Gulf Life Ins. Co.*, 197 Ga. 269, 29 S.E.2d 71 (1944); *see Pendley v. Union Bankers Insurance Co.*, 99 Ga.App. 189, 107 S.E.2d 910 (1959).

Plaintiffs RTC and P & C Bank, as loss payees and assignees of Mascot Pecan's insurance claims, stand in the shoes of Mascot Pecan, and therefore must prove that damage or loss occurred during the policy period. *Cf. Alipour v. State Auto Mut. Ins. Co.*, 131 F.R.D. 213, 216 (N.D.Ga. 1990). Home Insurance asserts that it is entitled to summary judgment because the Plaintiffs, who bear the burden of proof at trial, will not be able to sustain the burden of proving that the damage occurred after Home Insurance's policy went into effect on January 1, 1988. *See Coats & Clark*, 929 F.2d at 608 ("*Celotex* simply holds that under certain circumstances the movant may meet its Rule 56 burden without negating an element of the non-moving party's claim and that under such circumstances it is sufficient to point to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden"); *see also Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53 (clarifying burden of proof on summary judgment). In essence, Home Insurance's position is that the damage or loss to the pecans occurred (or was in progress) before the policy went into effect, and that therefore the pecans were not insurable. *See Summers v. Harris*, 573 F.2d 869 (5th Cir.1978); *Drewett v. Aetna Casualty & Surety Co.*, 539 F.2d 496 (5th Cir.1976) (both holding that there was no coverage under flood insurance policy where loss was in progress before policy went into effect).

As the RTC correctly points out, although the policy insures against damage or loss, the policy does not define damage or loss or identify any standards concerning the determination of the date of loss. The Plaintiffs, however, appear to concede that, for the purpose of determining coverage, the damage or loss occurred when the pecans were damaged and became unfit for human consumption, and not when they were released for voluntary destruction and actually destroyed.

### 1. The Movant's Initial Summary Judgment Burden

Home Insurance offers extensive evidence to show that the Plaintiffs will not be able to meet their burden of proof at trial. Home Insurance shows that even Mills Tarver, the president of Mascot Pecan, believes that the damage to the pecans occurred in the middle of the 1980s, and that

there is no definitive way to determine when the damage to the pecans occurred. In his deposition, Mills Tarver testified that he could not swear that the pecans which were condemned and destroyed in 1988 and 1989 were in saleable condition at the end of 1987. (Mills Tarver Dep. at 49.) He also stated that the loss probably occurred well before the policy went into effect:

Q. So what would the date of the loss actually be?

A. I assume the mid-eighties. That's all I can tell you. '86 or '85, I can't tell you. It happened all along. It didn't happen just one at a time. The mold just went through there. And then one day one box would be molded and the next day—well, a little later it would be rancid, because water can't—you can't put water in pecans and let them stay. They don't like that kind of stuff.

.     .     .     .     .

Q. And my question to you is, when did the Million Five Hundred Thousand Dollars damage occur? Can you be specific about that at all?

A. No, sir, I cannot be specific.

Q. You think that some of the damage occurred in 1985, 86, and '88?

A. I said the mid eighties.

(Mills Tarver Dep. at 97–98.) Mills Tarver also stated that he did not know when the insect defile listed in the GDOA's sample analyses occurred, but acknowledged that Mascot had a rodent problem since the mid–1980's. (Mills Tarver Dep. at 134.) Mills Tarver concluded that nobody could tell for certain when the pecans were damaged. (Mills Tarver Dep. at 115–116.)

Tim Tarver, who served as the general manager of Mascot Pecan's operations, testified that there was absolutely no way to determine the age of the pecans that were destroyed in 1989 and no way to determine when the pecans became unfit for human consumption. (Tim Tarver Apr. 9, 1990 Dep. at 31, 36.) Like his father, Tim Tarver admitted that the damage to the pecans began in the mid 1980s.

Home Insurance also points to the lack of any documentary evidence or product inventory system that could pinpoint when the pecans were damaged. The record contains numerous references to Mascot Pecan's failure to keep proper records, to inventory its product properly, to label the pecans by crop year, and to keep the damaged product from the 1984 embargo separate from its more recent product.

Running through all the briefs and depositions the parties have filed with the Court is the intimation of fraud on the part of Mascot Pecan. Home Insurance suggests that the evidence leads to the conclusion that Mascot Pecan Company held on to the bulk of the 1984 product to support collateral for investments. As the GDOA reports disclose, Plaintiffs cannot account for the disposition of almost one million pounds of the 1.8 million pounds of pecans the GDOA condemned in 1984. Moreover, Mascot Pecan employees Bill Griffin and Larry Eason testified that the Tarvers hid the damaged pecans from the GDOA inspectors. Griffin, who became the general manager of Mascot Pecan in May 1988, stated as follows:

Q. Do you have any idea of whether or not Mr. Tarver or Kenny or Timmy on their own destroyed any of those pecans because they had gotten wet or anything like that?

A. They didn't destroy them. They hid them.

Q. Where did they hide them at?

A. They would rent trailers, 40 foot trailers and store them.

Q. This was after you were there?

A. Yes. And they hid them from the Agriculture Department.

Q. Were those refrigerated trailers?

A. No, they weren't.

Q. Was it your understanding that when they started storing these in the trailers, that they were already ruined?

A. They were already ruined. They didn't, you know, they'd put them back in there for inventory purposes. You know, when the Agriculture Department come, they didn't want them destroyed, so they'd hide them in the trailer.

.     .     .     .     .

Q. Do you have any idea of what kind of volume of pecans they would hide in these trailers?

A. Well, a trailer would hold 40, 50, 60,000 pounds and there would be as many as, I would say, probably up to a half a million pounds, 400,000, probably eight to ten trailers loads at one time.

. . . . .

Q. Do you have any idea when these pecans went bad?

A. I don't you know, know for sure when they went bad. Just in my opinion—this is only my opinion—I think some of them had been bad for years. Some of them probably went bad after I got there.

(Griffin Dep. at 36–40.) Eason's description is similar. According to Eason, Mills Tarver ordered him to load seven trailers with boxes of damaged pecans on trailers at the end of 1987 to keep GDOA from discovering the damaged product. Tarver told him not to put boxes that already had GDOA "stop sale" tags on them in the front of the section of the trailers. Eason also testified that he began to put the damaged product that was in the boxes back on trailers into new boxes, and return them to Mascot Pecan's freezers in March 1988. (Eason Dep. at 20–25.)

Home Insurance offers this testimony to show that there is no genuine issue of material fact, and that the Plaintiffs will be unable to meet their burden of proof at trial. This evidence, which the Plaintiffs have not contradicted, leads the Court to suspect strongly that Mascot Pecan committed fraud. It also offers a possible explanation for the fate of the approximately one million pounds of pecans that were condemned in 1984, but were never destroyed or reconditioned. Although this evidence is strong, the Court will not, in this summary judgment posture, conclude that Mascot Pecan committed fraud or that all of the pecans at issue in this case derive from the 1984 condemnation. The Court need not reach these conclusions to decide, based on the other evidence, discussed above, that the Plaintiffs will not be able to meet their burden of proof at trial.

■ To summarize, Home Insurance has demonstrated that the Plaintiffs will not be able to meet their burden of proof at trial. A moving party cannot meet its initial burden on summary judgment by stating that the nonmoving party will not be able to meet its burden of proof at trial. The moving party must support its position by referring to the record. *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 n. 19 (11th Cir.1991) (citing *Coats & Clark*, 929 F.2d at 608). Here, Home Insurance has pointed to specific portions of the record that demonstrate that the Plaintiffs will be unable to prove that the damage occurred during the policy period. This situation is similar to the "unusual situation presented in *Celotex*, where neither party could prove either the affirmative or the negative of an essential element of the claim—exposure to Celotex's products...." *Coats & Clark*, 929 F.2d at 607.

### 2. *The Nonmovants' Summary Judgment Burden*

■ As *Celotex* and *Coats & Clark* make clear, however, the district court's inquiry does not end once the moving party has demonstrated that the nonmovant will not be able to meet its burden of proof at trial. Once this occurs, the burden shifts to the nonmovant to point to other portions of the record that show there is a genuine issue of fact. *Coats & Clark*, 929 F.2d at 607–608. Once Home Insurance moved for summary judgment, Plaintiffs were on notice to come forward with all their evidence that would indicate the existence of a genuine issue of material fact necessitating trial on the coverage issue.

After an extended discovery period, during which the parties took numerous depositions, the Plaintiffs have adduced five pieces of evidence, which they argue, demonstrate a genuine issue of material fact. The Court will examine this evidence.

First, the Plaintiffs proffer evidence of the inspections conducted by the GDOA. Before the insurance policy went into effect, the GDOA last inspected Mascot Pe-

can in September 1987. At that time, the GDOA discovered 4,680 pounds of pecans, which were part of the 1984 crop year. The GDOA found that these pecans were contaminated with mold and mildew as the result of water damage from a leaking roof. (Beecher Dep. at 51). After the inception of Home Insurance's policy, the GDOA, looking for adulterated product, performed several inspections. On June 28, 1988 and August 10, 1988 the GDOA supervised voluntary destructions of 24,800 pounds of pecans that were related to the 1984 embargo. (Wiggins Dep. at 53.) On July 5 and 6, 1988, however, the GDOA found 32 containers of adulterated product that were unrelated to the 1984 embargo. (Wiggins Dep. at 67.) On August 10, 1988, the GDOA again found pecans that were related to the 1984 embargo, and destroyed voluntarily 9,540 pecans. During a reinspection of Mascot Pecan in September 1988, the GDOA examined a large portion of Mascot Pecan's inventory, which Tim Tarver identified as part of the 1987 crop year and older, and determined that the pecans were damaged. On September 22, 1988, the GDOA wrote Mills Tarver a letter indicating that the pecans were "not fit for human consumption."

The Plaintiffs argue that a jury could conclude that because the GDOA did not find adulterated product until July 1988, the product did not become rancid and unfit for human consumption until after January 1, 1988. The Plaintiffs offer the testimony of Clarke Wiggins, Jr., the GDOA Consumer Division District Supervisor who inspected the Mascot facility several times in 1988, to establish this fact:

Q: Did you perform any inspections yourself or were you on site at any time prior to this occasion during the year 1988?

A: I was there prior to 12–25–88.

Q: On which dates?

A: 11–29–88 and 7–6–88, 7–5–88, 6–28–88.

Q: On 6–28–88, did you help perform an inspection at the facility?

A: Yes.

Q: Did you find any product that was contaminated or adulterated on that date that was not related to the 1984 embargo?

A. No.

Q: Do you feel like you would have found that product had it been there, or do you feel that you would have found adulterated product on that date had it been adulterated? Do you understand my question?

A: Yes, I do understand your question. That is a possibility.

Q: Part of the inspection routine and the purpose for it is to locate or verify whether or not adulterated product is on the premises; correct?

A: Yes. One of the primary purposes.

Q: And you would have been looking for adulterated product on that date?

A: Yes.

Q: But you did not find any adulterated product that was not related to the '84 embargo; correct?

A: To the best of my recollection, that's correct.

(Wiggins Dep. at 65.) Contrary to the Plaintiffs' assertions, the testimony of Clarke Wiggins does not create a genuine issue of material fact concerning whether the pecans were destroyed during the policy period. Wiggins' testimony establishes nothing more than the fact that the GDOA did not *discover* the adulterated product that is the subject of this lawsuit until July 1988. In response to the question concerning whether Wiggins felt that the GDOA would have discovered adulterated product had it been there, Wiggins testified only that it is a "possibility" that the GDOA would have found other adulterated product, if it existed. The GDOA inspectors' testimony demonstrates that the date of discovery is not the date of damage or loss. As GDOA Inspector David Beecher explained, the GDOA did not open every box and inspect every pecan; rather, the GDOA relied on visual inspection for obvious signs of decay and infestation, and randomly sampled pecans from apparently damaged lots. (Beecher Dep. at 33–37.) Moreover, some of the information contained in the

inspection reports and voluntary destructions slips was based on information supplied by the Tarvers, and not on the GDOA's independent investigation. (Beecher Dep. at 68.)

Further, only eight days elapsed between the GDOA's June 28, 1988 inspection, during which the GDOA found only adulterated product that was part of the 1984 embargo, and the July 5, 1988 discovery of 32 containers of pecans that were not identified as part of the 1984 embargo. On August 10, 1988, the GDOA again found adulterated product from the 1984 embargo in Mascot Pecan's warehouse. The randomness in the GDOA's discovery of adulterated product does not indicate any pattern from which a jury could conclude that the pecans were in good condition as of January 1, 1988, or that the loss was not already in progress at the time the policy went into effect. Indeed, during the inspection the GDOA conducted in September 1987, the GDOA found 4,680 pounds of pecans, which were contaminated with mold and mildew as the result of water damage from a leaking roof.

Plaintiffs also cite the inspection reports of Cameron Crummey, an inspector for the Warehouse Division of the GDOA, to establish that a genuine issue of material fact exists. As late as March 1989, Crummey's reports indicated that Mascot Pecan had sufficient inventory on hand to cover the warehouse receipts held by the Plaintiffs. Crummey did not report any signs of infestation or product adulteration. Nonetheless, the reports filed by GDOA Warehouse Division inspector Cameron Crummey are of no avail to the Plaintiffs. According to his deposition testimony, Cameron Crummey simply counted the boxes stored in Mascot Pecan's warehouses to determine whether Mascot Pecan had the requisite inventory on hand. Crummey stated that he "never opened [the boxes] nor weighed [them,]" and as far as he could tell, the boxes could have contained "sand or dirt or rocks or anything else." (Home Ins. Reply Br. at 11 (citing Crummey Dep. at 4–44, 116–120.)) Thus, Crummey's reports neither establish a genuine issue of material fact, nor indicate that the

Plaintiffs will be able to meet their burden of proof at trial.

The Plaintiffs also assert that a substantial portion of the pecans that are the subject of this suit were damaged after a roof leak that began in the spring of 1988. In the GDOA report relating to the July 5, 1988 inspection, Consumer Division Inspectors Wiggins and Beecher noted evidence of a leaking roof in one of the two main pecan freezers. The Plaintiffs also proffer the testimony of Mascot Pecan employee William Griffin, who stated that a roof leak in the spring of 1988 may have caused the mold on some of the pecans. (Griffin Dep. at 31–32). The Plaintiffs argue that this evidence creates an issue of material fact. In fact, Griffin testified the GDOA already had inspected and placed withhold tags on most of the pecans that got wet after May 1988. (Griffin Dep. at 40). Thus, although this evidence may suggest that a few pecans were damaged after the policy went into effect, the Plaintiffs cannot identify how many or which pecans were damaged by the 1988 roof leak. Because of Mascot Pecan's shoddy business practices, which included deficient recordkeeping and the commingling of pecans from different crop years, the Plaintiffs cannot identify, even imprecisely, the type and quantity of pecans damaged by the 1988 roof leak. Thus, the Plaintiffs will not be able to offer any evidence of damages at trial.

Moreover, the record discloses that roof leaks were an ongoing problem at Mascot Pecan. The Tarvers state that problems with roof leaks began in the mid–1980s. In September 1987, the GDOA noticed ice formations on the freezer floor, which they attributed to a roof leak. (Wiggins Dep. at 73–74.) Thus, Griffin's vague and speculative testimony is not concrete proof that creates a genuine issue of material fact.

Plaintiffs also argue that Home Insurance's description of Tim Tarver's testimony is inaccurate. They point to Tarver's statement that as many as 300,000 pounds of the pecans which were destroyed in 1989 were part of the 1988 crop year. (Tim Tarver Dep. of Aug. 8, 1991 at 48). Even viewed in the light most favorable to the

Plaintiffs, however, Tim Tarver's testimony is insufficient to create a genuine issue of material fact concerning whether even a portion of the loss occurred during the policy period. Tim Tarver testified:

Q. Can you give me any idea of what percentage of the crop that was ultimately destroyed during 1989 was part of the '88 crop?

A. No.

Q. Do you think it would have been 50,000 pounds?

A. It would have been more than that.

Q. It would have been more than 100,-000 pounds?

A. It could have been. Yes, I am sure it was.

Q. You think it would have been more than 150,000 pounds?

A. Yes.

Q. More than 200,000 pounds?

A. Like I say, we could have up to around 300,000 pounds of rework product or pieces or more than that. I am sure it could have been more than that, yes, from '88.

(Tim Tarver Dep. of Aug. 8, 1988 at 47–48). Tarver's testimony cannot be characterized as either affirmative evidence or a specific fact showing the need for a trial. *See Johns v. Jarrard*, 927 F.2d 551, 555 (11th Cir.1991). The Court is not engaging in an analysis of Tarver's credibility; rather, the Court finds that no reasonable jury could draw any reasonable inferences concerning the date of damage or loss from this testimony.

■ Finally, Plaintiffs contend that Jeffrey Brown, a property specialist for Home Insurance, had the opportunity to inspect the pecans when he inspected the premises in February 1988, shortly after the inception of the policy. The Court agrees with Home Insurance that the fact that Jeffrey Brown, a representative of Home Insurance, inspected Mascot Pecan's real property, but not the pecans, indicates nothing about the condition of the pecans and is immaterial to the issue of whether the Plaintiffs will be able to meet their burden of proof at trial. Although the Court believes that it would have been prudent for Home Insurance to inspect the pecan stock it insured, Georgia law does not impose a duty to inspect on the insurer.

In sum, the evidence presented by Home Insurance overwhelmingly establishes that the bulk of the pecans that are the subject of this claim were damaged before January 1, 1988. Although a portion of the pecans that were damaged in 1989 may have been damaged by a roof leak that occurred after the policy went into effect, Home Insurance has established that the Plaintiffs will not be able to show whether and how many pecans were damaged. The Court finds that Home Insurance has proven that the testimony proffered by the Plaintiffs is insufficient for a jury to find that the pecans that were destroyed in 1989 were damaged between January 1, 1988 and December 6, 1989, the effective dates of Home Insurance's insurance coverage. By contrast to the extensive documentary and testimonial evidence submitted by Home Insurance, neither P & C Bank nor RTC have presented the Court with a single witness who can state that the damage to the pecans occurred after January 1, 1988. Nor can the Plaintiffs present the Court with any evidence that details the condition of the pecans immediately before the policy went into effect. Therefore, the Court GRANTS Home Insurance's motion for summary judgment.

## II. Pennsylvania Millers Mutual and P & C Bank

■ P & C Bank has moved for summary judgment against Pennsylvania Millers on the ground that at least 500,000 pounds of pecans became rancid prior to the expiration of the bond on April 22, 1988. The bond was in effect from June 1975 to April 1988. P & C Bank alleges that Mascot Pecan breached its duties and obligations as a public warehouseman under the Georgia Warehousemen's Act. O.C.G.A. §§ 10–4–1 *et seq.* (1989). The Georgia Warehousemen's Act requires public warehousemen to comply with the rules and regulations of the Department of Agriculture. P & C Bank contends that, beginning in 1984, Mascot Pecan continuously

violated Rule 40–14–4.01, which requires licensed warehousemen to maintain all roofs in good repair and free from all leaks. The protection of the warehouse bonds extends to financial institutions, such as P & C Bank, who have extended credit based upon warehouse receipts.

In support of its motion for summary judgment, P & C Bank draws the Court's attention to the testimony of Tim Tarver and Larry Eason concerning Mascot Pecan's ongoing problem with roof leaks. (Tarver Dep. at 28 and Eason Dep. at 17.) P & C Bank also claims that the deposition testimony of Clarke Wiggins establishes that Mascot Pecan had insufficient inventory to meet the obligations of the warehouse receipts.

In response, Pennsylvania Millers argues that P & C Bank must demonstrate that the losses to Mascot Pecan's inventory during the bond period rendered Mascot Pecan unable to redeem the warehouse receipts it held. Millers claims that P & C Bank cannot prove that the loss resulted in depletion of the inventory below that covered by the warehouse receipts.

Several weeks after P & C Bank filed its motion, Pennsylvania Millers filed a cross-motion for summary judgment against both Plaintiffs RTC and P & C Bank. Pennsylvania Millers' motion for summary judgment elaborates on the grounds identified in its opposition to P & C Bank's summary judgment motion. The Court will addresses both motions in tandem.

### A. Damage or Loss During Bond Period

Like Home Insurance, Pennsylvania Millers argues that the damage or loss did not occur at any time during its period of coverage. Here, the result is quite different from the result of Home Insurance's argument.

Pennsylvania Millers contends that Plaintiffs will not be able to prove an express condition for recovery under the bond, namely that Mascot Pecan's breach of the bond, and its obligations as a public warehouseman, occurred prior to the termination of the bond on April 22, 1988. In order to recover for a breach of the bond, the Plaintiffs must prove that the inventory held by the principal was insufficient to redeem warehouse receipts. *Hartford Accident and Indemnity Co. v. State of Kansas*, 247 F.2d 315, 321 (10th Cir.1957).

The Plaintiffs contend that a jury should decide whether the pecans were damaged before the expiration of the warehousemen's bond in April 1988. In opposition to Pennsylvania Millers' motion, the Plaintiffs have submitted evidence to show that continuing damage to the pecans stored at Mascot Pecan began as early as 1984 and continued through the mid–1980s. As the GDOA reports, discussed in Part I, reveal, there was a significant condemnation of pecans at Mascot in 1984. On March 2, 1987, the GDOA issued a voluntary destruction certificate for the destruction of 6,077 pounds of pecans at Mascot Pecan Company. On September 14, 1987, 4,680 pounds of pecans were destroyed. In June and August of 1988, additional quantities of pecans were destroyed. Between July 1988 and October 16, 1989 the GDOA condemned and destroyed approximately 866,898 pounds of pecans. From these facts, the jury could draw a reasonable factual inference that a substantial part of the pecans that were condemned and destroyed, beginning in March 1987, and continuing through October 1989, were damaged before the expiration of the bond at the end of April 1988. Barely two and one half months elapsed between the expiration of the bond and the DOA's discovery of massive quantities of damaged pecans.

Plaintiffs also submit the deposition testimony of Larry Eason, cited in Part I, to show that the pecans were destroyed before April 22, 1988. Larry Eason's testimony creates a genuine issue of material fact precluding summary judgment in favor of Pennsylvania Millers. In short, the evidence is overwhelming that Mascot Pecan was in default during the bond period, and failed to maintain and store sufficient pecan inventory as collateral. Nonetheless, the Court will not grant summary judgment for P & C Bank on this basis because Millers has provided some evidence that

raises genuine questions about whether the damage or loss resulted in depletion of the inventory below that covered by the warehouse receipts. Therefore, the Court will allow the jury to decide this issue.

### B. Demand

Pennsylvania Millers argues that the Plaintiffs are barred from recovery because neither made a demand for the delivery of the collateral, the pecans, during the period of the bond. (Pennsylvania Millers' Statement of Undisputed Fact No. 9; Norris Dep. at 71.) Pennsylvania Millers argues that such a demand is a condition precedent for recovery under a warehouseman's bond because the warehouseman's obligation to deliver the product described by the warehouse receipt does not arise until the holder of the receipt makes a proper demand. *See* O.C.G.A. § 10–4–21; *Hartford Accident and Indemnity Co. v. State of Kansas,* 247 F.2d 315 (10th Cir. 1957).

In *Hartford Accident,* the court held that the mere fact that a warehouseman received more grain for deposit than he was capable of storing did not amount to a conversion of any depositor's grain. In dicta, the court explained that even if there was a misappropriation of stored grain, it would not result in a cause of action until a depositor made a demand for the grain. The court stated,

> The mere fact that [the warehouseman] received for storage more grain than he had storage capacity did not result in a conversion of any particular grain or prevent any grain offered from storage from becoming stored grain. There can be no conversion of any given depositor's grain until a demand for its delivery has been dishonored.

*Hartford Accident,* 247 F.2d at 320. The former Fifth Circuit adopted the Tenth Circuit's holding in *Millers Mutual Fire Insurance Co. of Texas v. Farmers Elevator Mutual Insurance Co.,* 408 F.2d 776 (5th Cir.1969). The Fifth Circuit held that the surety's obligations vested on the date the warehouseman breached his obligations under the bond by failing to deliver wheat on demand. The court explained: "In any event, the district court correctly held the obligation was breached upon the failure to load out the grain, and the key point in time is the date of refusal, citing and quoting from ... [*Hartford*], which we approve." *Millers Mutual,* 408 F.2d at 779.

Relying on these two cases, Pennsylvania Millers asserts that a warehouseman cannot be in default of his obligation under the bond if a proper demand for delivery of the commodity has not been made. Without such a demand, Pennsylvania Millers concludes, "there is no demonstration that the inventory on hand is insufficient to correspond to the warehouse receipts, or that a breach of the bond has otherwise occurred." (Pennsylvania Millers Resp. to Mot. for Summ.J. at 5.)

The Plaintiffs argue that there is evidence to support Mascot's inability to redeem the warehouse receipts during the period of the bond, and therefore demand would have been futile. As support for this proposition, the Plaintiffs cite a later Tenth Circuit case, *General Insurance v. Commodity Credit Corp.,* 430 F.2d 916 (10th Cir.1970), which modifies the Court's holding in *Hartford Accident.* In *General Insurance,* the Plaintiff sought to recover on two public warehouse bonds, termed Bond A and Bond B. The district court allowed the plaintiff to recover on Bond B, but denied recovery on the earlier bond, Bond A, because there had been no unsatisfied demand for the grain. The Tenth Circuit reversed the district court, and allowed the plaintiff to recover on Bond A, even though there was no unsatisfied demand for the grain, because the warehouseman had been in default throughout the bond period. The Court distinguished its holding in *Hartford Accident,* stating that an unsatisfied demand for the product stored in the warehouse was important "only as it relates to the discovery of the misconduct during the bond period." *General Insurance,* 430 F.2d at 918. The Court held that although a demand for the grain might be necessary to establish conversion, demand was not necessary if the warehouseman, without the knowledge of

the warehouse receipt holder, violated state law and the bond obligations during the bond period. As the Court explained:

> During the life of Bond A, [the warehouseman] had violated both the [state warehouse] law and the obligation of the bonds by disposing of grain in quantities which rendered him unable to satisfy his commitments to the depositors of grain ... The statute was violated, the agreement was breached, and the obligation of the bond was broken.

*Id.* The Court agrees with the Plaintiffs that *General Insurance* applies to this case. Although the general rule is that a warehouseman's duty to deliver goods will not arise until there has been a demand, where demand would clearly have been unavailing, a warehouseman may be held liable for failure to deliver the goods in the absence of any demand. *See* 93 C.J.S. *Warehousemen & Safe Depositaries* §§ 51, 72 (1956).

Moreover, although *General Insurance* is not controlling authority in this Circuit, the facts of this case are more analogous to the facts of *General Insurance* than to *Farmers Elevator Mutual.* In *Hartford Accident* and *Farmers Elevator Mutual,* the Court was concerned primarily with quantity shortages, and not, as alleged in this case, with an ongoing breach of obligation. Further, in *Farmers Elevator Mutual* and *Hartford Accident,* there was no evidence, apart from the unsatisfied demand, that the warehouseman had defaulted during the term of the bond. By contrast, there is strong evidence that Mascot Pecan was in violation of state law and the bond during the period of the bond, and consequently that Pennsylvania Millers is liable to the Plaintiffs in the amount of the bond. If the jury finds that Mascot Pecan breached its obligations as a public warehouseman during the bond period, and that demand would have been futile, then Mascot Pecan's breach of its statutory and contractual duties obviates the need for demand. Therefore, the Court DENIES Pennsylvania Millers' motion for summary judgment on this ground.

CONCLUSION

The Court has considered three substantive motions in this Order. With respect to Home Insurance's motion for summary judgment, after reviewing the motions, briefs, depositions, and interrogatories on file, the Court finds that Home Insurance is entitled to summary judgment because the Plaintiffs will not be able to meet their burden of proof at trial. To require a trial, when it is clear from the materials in the record that Plaintiffs cannot prove their claim against Home Insurance, would be a waste of time and judicial resources, and would unnecessarily restrict the proper use of summary judgment. *See Coats & Clark,* 929 F.2d at 608.

The Court, however, finds that a trial is necessary to resolve the Plaintiffs' claim against Pennsylvania Millers. A reasonable jury could conclude that the pecans which were the subject of the warehouse receipts were damaged during the bond period, and that Mascot Pecan's inventory was insufficient to redeem the warehouse receipts. Moreover, a jury could find that any demand for the pecans would have been futile, and therefore, the Plaintiffs are not precluded from recovering on the bond. To summarize, in this Order, the Court:

1. DENIES the Plaintiffs' motion to strike Home Insurance's reply brief;

2. DENIES the Plaintiffs' motion to strike Pennsylvania Millers' motion for summary judgment;

3. GRANTS the motion of Home Insurance for summary judgment;

4. DENIES P & C Bank's motion for summary judgment against Pennsylvania Millers; and

5. DENIES Pennsylvania Millers' motion for summary judgment.

SO ORDERED.