PLANTERS AND CITIZENS BANK and Resolution Trust Corporation as Receiver for Great Southern Federal Savings & Loan Association, Plaintiffs,

v.

PENNSYLVANIA MILLERS MUTUAL INSURANCE COMPANY, Clark Wiggins, Jr., David L. Beecher, Darrell Crosby and Cameron Crummey, Defendants,

and

PENNSYLVANIA MILLERS MUTUAL INSURANCE COMPANY, Defendant and Third Party Plaintiff,

v.

E. Mills TARVER and Hugh Oliver, Third Party Defendants.

No. CV: 490–283.

United States District Court,
S.D. Georgia,
Savannah Division.

March 22, 1992.

Ashley M. Hodges, Adams, Gardner & Ellis; Wendy Woods Williamson, Oliver, Maner & Gray, Savannah, Ga.; and Brian Daniel Solomon and Frederick Leo Bateman, Jr., Pennington, Wilkinson, Dunlap, Bateman & Camp, Tallahassee, Fla., for Planters & Citizens Bank.

Samuel Powel Inglesby, Jr., Inglesby, Falligant, Horne, Courington & Nash, Savannah, Ga., for Resolution Trust Corp.

Kenneth August Hindman, Drew, Eckl & Farnham, Atlanta, Ga., for Home Ins. Co.

John Milton Tatum, Miller, Simpson & Tatum, Savannah, Ga., for Pennsylvania Millers Mut. Ins. Co.

Robert Spencer Bomar and Kevin Allan Wangerin, Atlanta, Ga., for Georgia Dept. of Agriculture, Thomas T. Irvin, Clark Wiggins, Jr., David L. Beecher, Darrell Crosby and Cameron Crummey.

## ORDER

EDENFIELD, Chief Judge.

On February 19, 1992 this Court entered an Order resolving many of the issues the parties had submitted for summary judgment. 786 F.Supp. 977. Before the Court are the three remaining summary judgment motions. Planters and Citizens Bank has moved for summary judgment against Defendants David Beecher, Darrell Crosby, and Clarke Wiggins, Jr. Planters and Citizens Bank also has moved for summary judgment against Cameron Crummey and Thomas T. Irvin. The Defendants have submitted a counter motion for summary judgment on several counts of Planters and Citizens Bank's complaint. The Court will address these motions seriatim.

### BACKGROUND

#### A. Factual

In its Order of February 19, 1992, the Court set forth the background of this case in detail. Consequently, this Order sets forth only those facts that are necessary to address the motions pending before the Court. These facts are drawn from the parties' Local Rule 6.6 submissions, and from the briefs and depositions tendered by the parties.

To summarize, Mascot Pecan Company ("Mascot Pecan") owned and operated various Glennville, Georgia warehouses, which stored pecans and other agricultural commodities. Mills Tarver was the president of Mascot Pecan. Georgia law required Mascot Pecan, a public warehouseman, to procure a performance bond to secure its obligations under the Georgia State Warehouse Act. O.C.G.A. § 10-4-12 (1989). Mascot Pecan obtained a warehouseman's bond, which was in effect from June 20, 1975 until it was terminated on April 22, 1988, from Pennsylvania Millers Mutual Insurance Company.

Mascot Pecan secured financing for its operations by entering into a series of transactions with several banks. On September 7, 1988, Mascot Pecan executed promissory notes in the aggregate amount of $1.6 million to Great Southern Federal Savings Bank ("Great Southern"). Mascot Pecan pledged warehouse receipts covering a substantial portion of its inventory, as collateral, to Great Southern. The Resolution Trust Corporation ("RTC"), as receiver for Great Southern, now holds three warehouse receipts, one covering 250,000 pounds of shelled pecans, a second covering 230,000 pounds of in-shell pecans, and a third covering 274,000 pounds of in-shell pecans. On December 18, 1988, Mascot Pecan executed a $299,904.09 promissory note, secured by one warehouse receipt for 500,000 pounds of in-shell pecans and a second warehouse receipt for 158,000 pounds of shelled pecans, to Planters and Citizens Bank ("P & C Bank"). The promissory note renewed an existing loan. P & C Bank still holds these two warehouse receipts.

Mascot Pecan's activities as a public warehouseman and an agricultural producer were subject to regulation and inspection by the Georgia Department of Agriculture ("GDOA"). Thomas T. Irvin is the Commissioner of the GDOA, which is divided into several distinct divisions, including the Consumer Protection Division and the Warehouse Division. The Consumer Protection Division inspected the pecans stored in Mascot Pecan's warehouses for compliance with the Georgia Food Act, O.C.G.A. § 26-2-20 et seq. (1982 & Supp.1991). Defendants Clark E. Wiggins, David Beecher, and Darrel Crosby were inspectors for the Consumer Protection Division at all times material to the instant case. The Warehouse Division performed inspections pursuant to the Georgia State Warehouse Act, O.C.G.A. § 10-4-1 et seq. (1989). Defendant Cameron Crummey was a Warehouse Division inspector, responsible for examining Mascot Pecan and determining whether Mascot Pecan's warehouse was in compliance with the Warehouse Act.

Beginning in 1984, the Consumer Protection Division detected many problems with the pecans stored at Mascot Pecan. In July 1984, the GDOA condemned 1.8 million pounds of Mascot Pecan's pecan inventory. Over the following years, the Consumer Protection Division discovered small-

er amounts of adulterated product. The approximately 866,898 pounds of pecans that are the subject of this action were discovered by the GDOA, and voluntarily destroyed by Mascot Pecan, between July 1988 and December 1989. On September 12, 1988 the Consumer Protection Division inspected the premises and discovered adulterated product, unrelated to the July 1984 embargo. On September 22, 1988, Clarke Wiggins, District Supervisor of the Consumer Field Forces of the Consumer Protection Division, wrote to Mills Tarver, the president of Mascot Pecan and informed him that the pecans Tarver had identified as "reject stock"—pecans that Tarver planned either to use as oil stock or to reprocess—were "seriously damaged" and "unfit for human consumption." On December 6, 1988, the GDOA placed a withhold from sale on 573,640 pounds of shelled pecans, and took 23 samples from this batch of pecans for further testing. By letter dated May 1, 1989, William J. Moore, Assistant Commissioner for the Consumer Protection Division of the GDOA informed Mills Tarver, President of Mascot Pecan Company, that all pecans warehoused by Mascot Pecan were unfit for human consumption. The test results required Mascot Pecan to destroy voluntarily the pecans or to ship them to a non-food processor. Mascot Pecan destroyed this first batch of pecans, which weighed 573,640 pounds and was valued at $1,068,254.00, between May 16, 1989 and June 23, 1989. On July 6, 1989, the GDOA placed a withhold from sale on another 241,920 pounds of pecans. Mascot Pecan destroyed this second batch of pecans, valued at $477,333.00, between October 16, 1989 and October 19, 1989.

Although the Consumer Protection Division of the GDOA discovered, condemned, and supervised the destruction of portions of Mascot Pecan's pecan inventory in 1987, 1988, and 1989, the reports sent to the warehouse receipt holders by the GDOA's Warehouse Division did not reflect these problems. The GDOA sent a continuous series of reports from the Warehouse Division's inspection of Mascot Pecan, to P & C Bank, between September 16, 1985 and March 3, 1989. Defendant Cameron Crum-

mey performed these Warehouse Division inspections. During each inspection, Crummey followed and completed a standard reconciliation of inventory report, which was developed originally by the GDOA to monitor grain storage. In response to question nine of each report Crummey prepared after visiting Mascot Pecan, he stated that the stored pecans contained no infestation or other adverse condition. The reports also stated that sufficient pecans were stored to meet all warehouse receipt liabilities. The reports indicated that Mascot Pecan did not have "open storage"— meaning that all pecans stored at Mascot Pecan were owned by the company and were available for warehouse receipt liabilities. None of the reports contained any mention of the voluntary destruction of smaller lots of pecans in 1987 and 1988, due to infestation and water damage, or of the withhold from sale the Consumer Protection Division placed on large quantities of pecans in September and December 1988. Indeed, as late as March 3, 1989, the report prepared by Crummey indicated that 1,518,755 pounds of pecans, with a total value of $2,009.393.00, were available for warehouse receipt liabilities.

P & C Bank first learned of the problems with its collateral for the loan to Mascot Pecan in March 1989. On March 28, Georgia's Department of Banking and Finance informed P & C Bank, by telephone, that its primary collateral consisting of stored pecans had spoiled, and that Mascot Pecan was in "big" trouble with the GDOA. The Department of Banking and Finance recommended that P & C Bank initiate collection efforts and redeem its warehouse receipts. Also in late March, Jim Bridges, Assistant Commissioner of the GDOA informed P & C Bank that 384,000 pounds of pecans had been placed on withhold by the Consumer Protection Division, and that it appeared that there might not be enough pecans to cover outstanding warehouse receipts. On March 29, 1989, P & C Bank, through its attorney Michael Bankston, mailed a certified letter, which accelerated the promissory note and declared the entire balance due and payable, to Mascot Pecan.

The demand letter allowed Mascot Pecan ten days to pay off the remaining principal and interest. Although Mascot Pecan failed to do so, P & C Bank did not attempt to redeem its warehouse receipts following the expiration of the ten day period.

In April 1989, the Warehouse Division informed P & C Bank that the warehouse bond had expired, and that the Warehouse Division would no longer conduct inspections at Mascot Pecan or make any claims, representations or guarantees concerning the warehouse receipts. Previously, on January 1988, the GDOA had received a cancellation notice from Pennsylvania Millers Mutual Insurance Company, the surety, canceling Mascot Pecan's warehouseman's bond, effective April 22, 1988. Mascot Pecan was unable to secure a new bond, and therefore, the GDOA terminated Mascot Pecan's license. The record does not reflect whether the GDOA had informed P & C Bank in 1988 that it had revoked Mascot Pecan's license or whether P & C Bank possessed this information at that time. One year later, however, on April 18, 1989, the Warehouse Division informed P & C Bank, by letter, that the GDOA would no longer perform inspections at Mascot Pecan, and that the Warehouse Division made no claims, representations, or guarantees concerning any warehouse receipts issued by Mascot Pecan. On May 11, the GDOA again informed Mascot Pecan P & C Bank that "the bond expired April 22, 1988, and at that time, this Department was closely monitoring obligated inventories, which were of quantity reflected on the issued receipts in question." (Letter from John P. Norris, Assistant Director, Warehouse Division to Michael L. Bankston, dated May 11, 1989.) In the same letter, the GDOA stated: "As of our last Examination Report, dated March 3, 1989, Mascot Pecan Company had 1,005,575 pounds of in-shell pecans and 513,180 pounds of shelled pecans. The Department has also issued a 'withhold from sale' notice to Mr. Tarver for 384,000 pounds of shelled pecans."

Apart from accelerating the loan, P & C took no action to redeem the warehouse receipts until June 1989. After receiving a report from Great Southern, Tommy Hilliard of P & C Bank performed an inspection of Mascot Pecan. Although Hilliard observed signs of infestation in the Mascot Pecan warehouse, and found that many of the pecans stored in the warehouse were of poor quality, Hilliard believed that the loan to Mascot Pecan was secure because there were enough in-shell pecans present to cover P & C Bank's warehouse receipt and to cover the outstanding balance on the loan, even at a reduced price.

Later that month, Lamar Hendricks, a Mascot Pecan employee, informed Hilliard that the bulk of the pecans Hilliard saw at Mascot Pecan were not available for the warehouse receipt holders because these pecans belonged to other storers, such as Claxton Bakery. At this point, Hilliard became alarmed, and P & C Bank began to make arrangements to redeem the warehouse receipts and recover the collateral. Before P & C Bank was able to recover the collateral, Mascot Pecan declared bankruptcy on June 30, 1989.

B.  Procedural

On October 1, 1991, this Court granted the motion to dismiss under Fed.R.Civ.P. 12(b)(1) of the GDOA and Thomas T. Irvin, Clark Wiggins, Jr., David L. Beecher, Darrell Crosby, and Cameron Crummey. The Court found that the Eleventh Amendment barred the RTC's suit against the GDOA, and that the Eleventh Amendment also barred the RTC's suit against the individual GDOA employee Defendants in their official capacities. Because the Court lacked subject matter jurisdiction over the RTC, the Court also dismissed the claims of P & C Bank against the GDOA and individual GDOA employee Defendants because it lacked ancillary jurisdiction over these claims. The Court indicated that the Plaintiffs could move for leave to amend the complaint if they had legitimate personal capacity claims against any of the Defendants.

On November 13, 1991, the Court allowed RTC and P & C Bank to file amended complaints. Counts IX to XII of P & C Bank's Fourth Amended Complaint and

Counts IX to XII of RTC Second Amended Complaint assert individual claims against Clarke Wiggins, Jr., David L. Beecher, Darrell Crosby, and Cammeron Crummey.[1] In that Order, the Court indicated that it would consider the previously Defendants' Motion for Summary Judgment on Behalf of Wiggins Beecher, and Crosby and Counter Motion for Summary Judgment on Counts IV Through VIII of Planters and Citizens' Third Amended Complaint "to the extent that they relate to the personal capacity claims now stated in the Plaintiffs' amended complaints." (Order of Nov. 13, 1991.) The Court also stated that it would not consider the lingering official capacity allegations which the Plaintiffs needlessly included to preserve those issues for appellate review.

## ANALYSIS

### I. *Summary Judgment*

The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56 advisory committee note). The Court "must determine whether there is any genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law." *Warren v. Crawford*, 927 F.2d 559, 561 (11th Cir.1991); *Regan v. United States Small Business Admin.*, 926 F.2d 1078, 1080 (11th Cir.1991) (both citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir.1990), *cert. denied,* —— U.S. ——,

111 S.Ct. 2056, 114 L.Ed.2d 461 (1991). The movant typically must discharge this burden by producing evidence that negates an essential element of the nonmovant's claim. *E.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

Only after the movant successfully discharges this initial burden, does the burden shift to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. *Thompson v. Metropolitan Multi–List, Inc.*, 934 F.2d 1566, 1583 n. 16 (11th Cir.1991); *see Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir.1987). "Factual disputes that are irrelevant or unnecessary will not be counted." *United States v. Gilbert*, 920 F.2d 878, 883 (11th Cir.1991) (citation omitted). The nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Gilbert*, 920 F.2d at 882. This means that the nonmovant "must set forth specific facts showing that there is a genuine need for trial." *Johns v. Jarrard*, 927 F.2d 551, 555 (11th Cir.1991) (citation omitted).

In assessing whether the movant is entitled to summary judgment in its favor, the district court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. *E.g., Regan*, 926 F.2d at 1080; *Gilbert*, 920 F.2d at 882. A mere "scintilla" of evidence supporting the opposing party's position, however, will not suffice. *E.g., Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990). "Where the record, taken as a whole could not lead a rational trier of fact to find for the nonmoving party, then there is no genuine issue for trial." *Matsushita Elec. Indus.*

---

1. Counts IX to XII of the Plaintiffs' amended complaints repeat the allegations contained in Counts IV to VIII of the Plaintiffs' earlier complaints.

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. *GDOA's Motion for Summary Judgment on Behalf of Beecher, Wiggins, and Crosby*

■ Although the Plaintiffs have sued Beecher, Wiggins, and Crosby in their personal capacities, the Plaintiffs' claims allege violations of the Defendants' official duties as inspectors for the Consumer Protection Division of the GDOA. The gravamen of the Plaintiffs' complaints is that Wiggins, Beecher, and Crosby "owed a duty ... as storer of goods in a public licensed warehouse, to properly inspect warehouses to protect the interests of persons storing products in public warehouses." (*See* P & C Bank's Fourth Amended Complaint and RTC's Second Amended Complaint). A suit for damages based on negligence in performing official duties can be brought against these Defendants in their personal capacity. *Cf. Hafer v. Melo,* — U.S. —, —, — – —, 112 S.Ct. 358, 361, 363–64, 116 L.Ed.2d 301, 309, 311–12 (1991) (under 42 U.S.C. § 1983, state officials may be held liable in their personal capacity for actions they take in their official capacity).

The Plaintiffs allege that these Defendants owed a duty to destroy the condemned pecans expeditiously. The Plaintiffs charge that Consumer Protection Division's inspectors should have required prompt disposal of the adulterated pecans found at Mascot Pecan in July 1984. Their failure to do so, allege the Plaintiffs, created and maintained the false impression that sufficient marketable inventory was present to cover the warehouse receipts held by RTC and P & C Bank. The Plaintiffs also claim that these Defendants should have communicated the results of their inspections of Mascot Pecan, and their knowledge that Mills Tarver was using spoiled pecans as collateral, to the Warehouse Division, and to the warehouse receipt holders.

Beecher, Wiggins, and Crosby contend that they no owed no legal duty to the Plaintiffs to destroy the condemned pecans

expeditiously because the Plaintiffs are not consumers, and therefore do not fall within the ambit of protection of the Georgia Food Act. O.C.G.A. § 26–2–20 *et seq.* (1982 & Supp.1991). These Defendants also contend that they had no duty to communicate this information to the warehouse receipt holders because their duties are circumscribed by the Georgia Food Act.

The Georgia Food Act prohibits the "holding, storage or offering for sale" of any "adulterated" food. O.C.G.A. § 26–2–22 (Supp.1991). The Act commands the Commissioner of Agriculture to employ and prescribe the duties of the personnel necessary to enforce the Act's provisions. O.C.G.A. § 26–2–33 (1982). As agents of the Commissioner, inspectors are directed to embargo, condemn, render unsalable or destroy "any meat, seafood, poultry, vegetables, fruit, or other perishable articles which are unsound, which contain any filthy, decomposed or putrid substances, or which might be poisonous or deleterious to health or otherwise unsafe...." O.C.G.A. § 26–2–38 (Supp.1991). Vested with this enforcement authority, Consumer Protection Division inspectors inspect food warehouses, processing plants, and retail firms to ensure that adulterated or misbranded food is not sold to consumers.

In this case, the mandate of the Georgia Food Act intersects with basic principles of Georgia tort law. Beecher, Wiggins, and Crosby argue that they cannot be held personally liable under the Georgia Food Act because they owed no legal duty to the warehouse receipt holders. Under Georgia law, "[l]iability in every tort case rests on the breach of a duty and resultant injury or damage to him to whom the duty is owed." *Cooper v. Anderson,* 96 Ga.App. 800, 805, 101 S.E.2d 770 (1957), *aff'd,* 214 Ga. 164, 104 S.E.2d 90 (1958). " 'If there is no duty, there can be no negligence. If the defendant owes a duty, but does not owe it to the plaintiff, the action will not lie.' " *Atlanta & Charlotte Air–Line Ry. Co. v. Gravitt,* 20 S.E. 550, 93 Ga. 369, 400 (1894) (quoting 1 Shear. & Redf. on Negligence § 8). A plaintiff does not have a cause of action for a defendant's violation of a statute or negligence *per se* unless the defen-

dant owed a duty toward him: "It is not sufficient that there be a general duty to the public which is violated, 'but in all civil cases, the right to enforce such a duty must reside in the individual injured because of a duty due from his injurer, or he cannot recover.'" *Gravitt*, 93 Ga. at 401, 20 S.E. 550 (quoting 16 Am. & Eng.Encyc. of Law at 411–12.)

Beecher, Wiggins, and Crosby argue that they owed no duty to the warehouse receipt holders under the Georgia Food Act. The Georgia Court of Appeals has examined the Georgia Food Act, and held that an action for damages, other than one arising from the consumption of food, cannot be brought under the Act, for the purpose of the Act is to protect food consumers. *Potts v. Fidelity Fruit & Produce*, 301 S.E.2d 903, 165 Ga.App. 546 (1983). In *Potts*, the plaintiff, an employee of a produce store, sued the distributor and transporter of bananas under the Georgia Food Act, to recover for personal injuries allegedly caused by a spider bite he received while unloading bananas from the delivery truck. The Court of Appeals granted summary judgment in favor of the defendant, finding that the plaintiff was not among the class of persons whom the Georgia Food Act was designed to protect. The appellate court adopted the analysis of the trial court:

> "Clearly, the Act is a consumer protection act, designed not to render the workplace a safer environment, but to prevent the sale and distribution of adulterated or misbranded foods to consumers. While safety in the workplace, and compensation for injuries arising out of work activities, are indeed matters of contemporary concern, they are the subject of other legislative enactments on both the state and federal level." Because the appellant's alleged injuries did not arise incident to his consumption of the bananas, we hold that the trial court was correct in concluding that the Act affords him no basis for recovery.

*Potts*, 301 S.E.2d 903, 165 Ga.App. at 547. The *Potts* opinion stresses the limited scope of recovery under the Georgia Food Act.

Notwithstanding the plain language of *Potts*, the Plaintiffs make a far-fetched and illogical argument that Georgia Food Act protects the Plaintiffs because P & C Bank and Great Southern were "direct participants in the production and distribution of the food product to the extent that without their participation, no distribution could be had no funds would be available." (RTC at 9.) The financial link between the Plaintiffs and Mascot Pecan does not make the Plaintiffs "consumers" within the meaning of *Potts*. The Plaintiffs fall outside the food chain contemplated by the statute. Although Wiggins, Beecher, and Crosby may have been negligent in allowing Mascot Pecan to maintain the embargoed pecans in its warehouse for years after the July 1984 condemnation, the Court agrees that these particular Plaintiffs are precluded from recovery because the injury to the Plaintiffs is not the injury the Georgia Food Act was designed to prevent.

Plaintiffs also make a broad argument that is not rooted in any cognizable duty the inspectors may have owed to the Plaintiffs. In essence, Plaintiffs claim that because the Commissioner of Agriculture has broad responsibilities over the agricultural industry in Georgia, which include the authorization to inspect warehouses to ensure the proper storage of agricultural products, the Consumer Protection Division inspectors may be held liable for failure to report the damaged condition of the pecans to the holders of bonded warehouse receipts of the GDOA. RTC argues, "The legal duties of the inspectors of the CPD are governed not only by statute but also by the authority and direction of the DOA.... DOA would now separate its inspectors into totally self-contained divisions so that an inspector looking at the quality of food under Title 26 has no responsibility to communicate with his fellow employees at the Department regarding quantity of product being certified by the Department under Title 10 of the Georgia Code, even when the first inspector is told that the rancid product is being held as collateral for lenders!" (Br. of Pl. RTC Opp.Mot.Summ.J. of Defts. Beecher, Crosby, and Wiggins at 8–9.) P & C Bank

contends, "Beecher, Wiggins, and Crosby now assert that since they were not responsible for the warehouse license, that they owed no duty to report the discovery of adulterated product to P & C Bank or others at DOA who had responsibility for the warehouse license.... However, these defendants were all employed by the DOA which has the responsibility both for food licenses and warehouse licenses." (P & C Bank's Mem.Opp. GDOA's Mot. Dismiss and Mot.Summ.J. on Behalf of Beecher, Crosby, and Wiggins at 14.) The Plaintiffs' language is telling. Both Plaintiffs attempt to pin personal liability on Beecher, Wiggins, and Crosby based on the GDOA's overall responsibilities. Although Plaintiffs' allegations may support a claim against the GDOA or Thomas T. Irvin, the Court already has dismissed these Defendants. The Court cannot convert these allegations into genuine personal liability claims against Beecher, Wiggins, and Crosby, who owed no duty to report to warehouse receipt holders. Therefore, the Court GRANTS the Defendants' Motion for Summary Judgment. This result obviates the need to consider the Defendants' counter motion on the counts that relate to Beecher, Wiggins, and Crosby.

### III. *Cameron Crummey*

#### A. P & C Bank's Motion for Summary Judgment

■ P & C Bank has moved for summary judgment against Thomas T. Irvin and Cameron Crummey. Because the Court dismissed Thomas T. Irvin from this case in its Order of November 13, 1990, P & C Bank's motion is moot as to all claims against Irvin. The Court will, however, consider the motion for summary judgment as it relates to Count XII of P & C Bank's Fourth Amended Complaint, which alleges that Cameron Crummey's inspections of Mascot Pecan were negligent and that the reconciliation of inventory reports were inaccurate.

The Georgia State Warehouse Act imposes a duty on the

> Commissioner and his duly authorized agents and employees ... to inspect public warehouses operated under this Article, to inventory, and to check the agricultural product so as to ascertain the conditions of such products and to determine whether or not the business is conducted in such a manner as to protect the interests of persons who are storing or may store such products.

O.C.G.A. § 10-4-15 (1989). The Act also requires inspectors to make sworn reports of their findings to the Commissioner, who shall hold and keep such reports in the records of his office." *Id.* This duty to inspect and to protect the interests of storers and depositors runs to the warehouse receipt holders. (Truby Dep. at 13.)

P & C Bank has submitted the deposition testimony of Crummey and Bill Truby, the Assistant Commissioner of the Warehouse Division, to establish that Crummey breached this duty. In his deposition testimony, Truby explained the duties of Warehouse Division inspectors:

Q. Are the inspectors asked to comment on whether or not there is infestation in any of the products?

A. Yes, as our reconciliation report shows.

Q. What types of procedures or what things are the auditors supposed to look at, if you know, when they're looking for infestation? Are there any specific guidelines for them to look at?

A. Yes, the obvious; swarming insects, obvious discoloration, smell or moldy or damaged grain, cotton that has been set off by an oil slick, set off by a holster motor or something.

Q. Each of the auditors should be aware of situations that might indicate the product is damaged?

A. Yes.

Q. So the function of the warehouseman or the warehouse examiners is not solely confined to quantity?

A. That is correct.

(Truby Dep. at 38.) P & C Bank also refers to Crummey's "no" response to question nine of the reconciliation inventory form, which asks: "Was any infestation, heat, moisture or other adverse condition

detected in stored grain? (If yes, give full explanation and remarks below, and advise warehouseman)." (Reconciliation of Inventory Examiners Grain Report, Mar. 3, 1989.) In his deposition, Crummey stated that despite the existence of question nine, it was his understanding that he had no obligation to check for infestation, heat, moisture or other adverse conditions in the pecans. (Crummey Dep. at 65.) According to P & C Bank, the following colloquy reveals Crummey's negligence:

Q: Now, No. 9 states was any infestation, heat, moisture, or other adverse condition detected in stored pecans, and your answer is no.

A: Well, I didn't inspect for any of that. I know no was there for 9 but I was not instructed to inspect pecans. We had another division that checked quality and sanitation. The Consumer Protection Division, I believe, is the division of the Department of Agriculture that was responsible for that.

.    .    .    .    .

Q: In fact, you verified on that that there was not any infestation, heat—

A: No, that I didn't find any.

Q: That you didn't find any heat—

A: Detected, I didn't find any.

Q: You didn't detect any?

A: I wasn't looking for it. There wasn't for me to find it if I wasn't looking for it.

Q: Of course, you couldn't have detected it, because you didn't open the boxes and look at pecans, did you?

A: No, sir.

Q: They could have been totally and completely rotten and you wouldn't have known about it; is that right?

A: That's right.

Q: Did you ever go and check with the consumer people that were also inspecting to find out whether—

A: No, sir.

Q: Let me finish. They had any records that there was infestation, heat, moisture or other adverse conditioned?

A: It's not my job to check with the Consumer Protection to see what they had found. I did not, no, I never checked with them.

Q: So, No. 9 does not mean that there wasn't any infestation, heat, moisture, or other adverse condition? You don't know?

A: I don't know.

(Crummey Dep. at 65–67.) The Plaintiffs have also referred to testimony in which Crummey admits that he did not actually count the boxes to determine Mascot Pecan's inventory. (Crummey Dep. at 53–54.) Instead, he relied on the inventory figures Mills Tarver supplied, and Mills Tarver's representations that Mascot Pecan owned all the pecans in the warehouse and that there was no open storage. (Crummey Dep. at 43–53.)

In addition to this evidence that P & C Bank contends establishes Crummey's breach of his duties, P & C Bank also argues that it has proven causation and damages, as a matter of law. P & C Bank has submitted the affidavits of two bank officials who state that they relied on the reconciliation of inventory reports, which were forwarded by the GDOA to P & C Bank, to renew the promissory note and to monitor the value of the collateral. (See McDaniel Aff. and Hilliard Aff.) Because the reports did not disclose that Mascot Pecan's inventory was insufficient to cover its warehouse receipt liabilities, P & C Bank alleges that it lost $691,000.00, the value listed on the face of the warehouse receipts.

In response, Crummey argues that "a question of fact remains concerning whether Crummey had to perform warehouse inspections in the manner suggested by Planters and Citizens, or whether he was correct in following the procedures established by the Warehouse Division." (Resp. to Pl's. Mot.S.J. against Defts. Irvin and Crummey at 4.) Even though Crummey's breach of duty appears clear to the Court, other evidence submitted by the Defendant to support his contention that P & C Bank has not established negligence as a matter of law creates a genuine issue of material fact necessitating trial.

First, Crummey raises the issue of whether P & C Bank reasonably relied on the warehouse inspection reports. The Defendants point out that Crummey's duty under the Warehouse Act was not to P & C Bank individually, but to inspect Mascot Pecan in accordance with the Warehouse Act and to submit his reports to the Commissioner. According to Truby, however, the GDOA sent individual inspection reports to warehouse receipt holders on a regular basis, after they requested the reports. (Truby Dep. at 14.) The Court finds that these actions, coupled with the plain language of the statute, establish a duty to the warehouse receipt holders.

The Defendants also proffer the testimony of Robert McDaniel, a P & C Bank official, to establish that P & C Bank did not review the Warehouse Division's examination procedures, and that P & C Bank did not contact the Warehouse Division to determine how the GDOA checked for quantity or quality as represented in the reconciliation of inventory reports prepared by Crummey. Although P & C Bank did not have statutory duty to investigate, a jury should decide whether P & C Bank's reliance on the GDOA reports, without further investigation, was reasonable.

Finally, the Defendants assert that a jury must decide whether there is any legal causal connection between Crummey's alleged negligence and the injury suffered by P & C Bank because there is no evidence to support P & C Bank's allegations that there were insufficient pecans to cover the warehouse receipts it held. Defendants argue that because Crummey's last report before P & C Bank renewed the promissory note in December 1988, was submitted in November, P & C Bank must be able to present evidence that as of November 23, 1988, there were insufficient pecans in Mascot's warehouse to satisfy outstanding receipts. As this Court held in its February 19, 1992 Order, there is sufficient evidence in this case from which a jury could conclude that Mascot Pecan's inventory could not cover the warehouse receipts, even before the two major voluntary destructions of pecans in May and October of 1989.[2] The Court, however, cannot determine this issue as a matter of law. Therefore, the Court DENIES P & C Bank's motion for summary judgment against Cameron Crummey.

### B. The Counter Motion

The Court also will consider the Defendants' counter motion, as it relates to Cameron Crummey, at this time. Because, as explained above, Thomas T. Irvin and the GDOA are no longer defendants, and the Court already has granted summary judgment in favor of Beecher, Wiggins, and Crosby, the only remaining issue presented by the Defendants' counter motion is whether Crummey is entitled to summary judgment against the Plaintiffs.

In support of the counter motion for summary judgment on this issue, the Defendant claims that the undisputed evidence establishes that P & C Bank failed to use ordinary care to avoid known problems at Mascot Pecan, and the alleged negligent acts by the GDOA, in violation of O.C.G.A. § 51–11–7 (1982). Crummey contends that P & C Bank could have avoided any injury by acting prudently and in a timely manner. In essence, Crummey argues that summary judgment is warranted because P & C Bank's failure to redeem the warehouse receipts, or otherwise recover its collateral, even after it learned of the troubles at Mascot Pecan, precludes P & C Bank from recovery.

As P & C Bank points out, however, none of the cases Crummey cites stand for the proposition that a complaint should be dismissed as a matter of law or that summary judgment should be granted based on the doctrine of contributory or comparative negligence. Because Georgia follows the

---

**2.** P & C Bank claims damages in the amount of $691,000, the value of the pecans stored at Mascot Pecan plus, costs, interest, and attorney's fees. Crummey claims that P & C Bank is not entitled to the full value of the warehouse receipts because it held only a security interest in the pecans. Crummey argues that the measure of damages should be the amount of the note, $299,904.09, plus any allowable interest. Therefore, the Court directs the parties to submit proposed jury charges, along with supporting cases, on this issue, ten days before trial.

rule of comparative negligence in apportioning liability among tortfeasors, O.C.G.A. § 51–11–7 bars recovery only if a plaintiff's negligence is equal to or greater than the aggregate negligence of all defendants. *Union Camp Corp. v. Helmy*, 367 S.E.2d 796, 258 Ga. 263 (1988). The burden of proving the plaintiff's negligence falls upon the party relying on the affirmative defense. *Glenridge Unit Owners Ass'n v. Felton*, 360 S.E.2d 418, 183 Ga.App. 858, 861 (1987). Therefore, P & C Bank is precluded from recovery only if Crummey can show that P & C Bank's negligence was equal to or greater than Crummey's alleged failure to inspect Mascot Pecan and provide accurate reports of the company's situation.

The evidence submitted by Crummey does not prove, as a matter of law, that P & C Bank is not entitled to recover. As evidence, Crummey argues that the March and April 1989 communications from the Department of Banking and Finance, the Warehouse Division, and Jim Bridges of the GDOA put P & C Bank on notice that there were problems at Mascot Pecan and that P & C Bank needed to redeem its warehouse receipts. Although P & C Bank accelerated its note on March 29, 1989, Crummey argues that P & C Bank's failure to redeem the warehouse receipts during the spring of 1989 or to take any action to protect its collateral until late June 1989 was the proximate cause of the injury suffered by P & C Bank. Crummey cites the deposition testimony of Tim Tarver to establish that there were a million pounds of company-owned pecans in the Mascot Pecan warehouse in March 1989. Crummey argues, "The evidence clearly shows that had Planters and Citizens acted promptly upon notification of the problems at Mascot Pecan Company, and redeemed their warehouse receipts at any point between March 28 and the end of June, the injury which occurred at P & C could have been avoided." (Br.Supp. Counter Motion for S.J. against P & C Bank at 22.)

In response, P & C Bank argues that Crummey's evidence that P & C Bank could have avoided the damage rests on flawed factual premises. First, P & C Bank argues that the Defendant's main criterion for determining that P & C Bank failed to exercise ordinary care is the presumption that the March 3, 1989 report, which indicated that a total of 1,518,755 pounds of pecans were stored at Mascot Pecan, and were available for warehouse receipt liabilities, is accurate. P & C Bank argues that the report was false, and that it was never informed that the March 3, 1989 report was erroneous. Indeed, even the May 11, 1989 letter from Norris, the Assistant Director of the Warehouse Division to Michael Bankston, P & C Bank's attorney, which discussed the expiration of Mascot Pecan's warehouseman's bond and the subsequent license termination, indicated that Mascot Pecan had 1,005,575 pounds of in-shell pecans and 513,180 pounds of shelled pecans. That letter also informed P & C Bank that the GDOA had issued a "withhold from sale" notice to Mills Tarver for 384,000 pounds of shelled pecans. P & C Bank argues that its actions were not negligent, based on its understanding that the March 3, 1989 report was accurate: "Even subtracting 384,000 pounds from the total amount of pecans supposedly stored at Mascot Pecan company, indicates that 1,134,755 pounds remained at Mascot and available for redemption." (P & C Bank's Mem.Opp. to GDOA's Counter Motion for Summ.J. at 8.)

P & C Bank also asserts that the GDOA has supplied no reliable evidence that any pecans of any value existed at Mascot Pecan any time following notification to P & C Bank of problems at Mascot, and therefore any attempts to redeem the warehouse receipts would have been futile. P & C Bank argues that Tim Tarver's statement that there were a million pounds of company-owned pecans in the Mascot Pecan warehouse in March 1989 is irrelevant because Tarver did not have personal knowledge of the facts. Tarver's deposition testimony reveals that he was not present when Crummey inspected Mascot Pecan's warehouse, and had no knowledge independent of that contained in the March 3, 1989 report:

Q: In 1989, were there a million pounds of inshelled pecans in the warehouse?

A: I am sure there was.

Q: Would all those inshelled pecans have been owned by Mascot Pecan Company?

A: Yes. If it was measured by the Warehouse Division as being there, it would have been owned by the pecan company.

Q: So, you have no knowledge that when they—when your father, Mr. Tarver and Mr. Crummey went into the warehouse, that they would have counted any of the nuts owned by Claxton or Pennington or Durden that were stored in the warehouse?

A: I would assume that they counted company-owned nuts. I wasn't there. I don't remember the exact ones. That's about the amount of inshelled that we bought every year.

(Tim Tarver Dep. at 33–34.) As the Court stated in its Order of February 19, 1992, the evidence is overwhelming that Mascot Pecan failed to maintain and store sufficient pecan inventory as collateral. Moreover, there is sufficient evidence from which a jury could conclude that any attempt by P & C Bank to redeem the warehouse receipts in April 1989 would have been futile because the pecans designated as collateral were already damaged, and the remaining pecans did not belong to Mascot Pecan. Because there are genuine issues of material fact in dispute, the Court DENIES the counter motion.

## CONCLUSION

At last the Court has concluded its review of the six summary judgment motions, three motions to dismiss, and numerous miscellaneous motions filed by the parties. To summarize, in this Order the Court:

1. GRANTS the motion of Defendants Beecher, Wiggins, and Crosby for summary judgment;

2. DENIES P & C Bank's motion for summary judgment against Cameron Crummey;

3. DENIES the Defendants' counter motion for summary judgment on behalf of Cameron Crummey; and

4. ORDERS the parties to submit proposed jury charges on the issue of damages, as outlined in footnote two of this Order.

Most of the original Defendants, including the Home Insurance Company, the Georgia Department of Agriculture, Thomas T. Irvin, David Beecher, Clark Wiggins, Jr., Darrell Crosby, are no longer Defendants in this case. Only two of the Plaintiffs' claims remain for trial. At trial, the jury will consider the Plaintiffs' claim against Pennsylvania Millers Mutual Insurance Company and the Plaintiffs' claim against Cameron Crummey.

SO ORDERED.